1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| CONSTANCE M. MORPHEW, | ) | 1:08-cv-00864 GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

11
12
13
14
15
16
17
18
19

**BACKGROUND**

20

Plaintiff Constance M. Morphew ("Plaintiff") seeks judicial review of a final decision of

21 the Commissioner of Social Security ("Commissioner") denying her application for disability

22 insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social

23 Security Act.  The matter is currently before the Court on the parties' briefs, which were

24 submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate

25 Judge.[1]

26
27

---

28    [1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On July 25, 2008, the action was reassigned to the Honorable Gary S. Austin for all purposes.

## FACTS AND PRIOR PROCEEDINGS[2]

On or about January 5, 2006, Plaintiff filed applications alleging disability since January 3, 2006, due primarily to an ankle injury.  AR 68-70.  Her application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 51-61.  ALJ Michael J. Haubner held a hearing on October 4, 2007, and issued an order denying benefits on January 9, 2008.  AR 18-27, 353-385.  On April 24, 2008, the Appeals Council denied review.  AR 4-7.

Hearing Testimony

ALJ Haubner held a hearing on October 4, 2007, in Fresno, California.  Plaintiff appeared and was represented by Richard Hundal.  Vocational Expert ("VE") Thomas C. Dachelet also provided testimony.  AR 353.[3]

Plaintiff was born September 3, 1965.  AR 361.  Concerning her educational background, Plaintiff possesses a GED.  AR 361.  She became disabled on January 3, 2006.  AR 361.

Plaintiff lives with her husband of twenty-five years and their four children.  AR 362.  Two of her children, ages nineteen and twenty, are disabled.  She drives them to their special needs school and to doctor visits, and ensures they bathe themselves and take their medication.  AR 362.  The children dress themselves, but require reminders about brushing their teeth.  AR 363.

Plaintiff can attend to her own personal needs, including brushing her teeth, dressing, bathing and hygiene.  AR 363.  She cooks and does so on a nightly basis.  AR 363.  She also does simple meal preparation, such as making a sandwich or heating something in the microwave, and will do so two or three times a day.  AR 364.  Plaintiff does the grocery shopping twice a week, and shops for other necessities once a month.  AR 367.

Plaintiff may wash dishes twice a week or so, otherwise that chore is handled by her children.  AR 364-365.  She does laundry twice a day, and makes the bed about once a week.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] Plaintiff's husband was present as an observer only.  AR 355.

1   She will change the sheets on the bed "probably twice a week."  AR 365-366.  Plaintiff dusts

2   every day, and vacuums or sweeps once a week.  AR 366.  She does not take out the trash, mop

3   the floors or wash the windows.  AR 367.

4        Plaintiff testified that she does not have any pets[4] or livestock to care for, nor does she

5   perform any yard work.  AR 367.

6        Plaintiff does not attend church[5] or other club or group based activities on a regular basis.

7   AR 367.  She visits with family or friends about three times a month, but speaks to them on the

8   telephone everyday.  AR 367.

9        About three times a week, Plaintiff drives her SUV to take the children places.  She does

10  not drive them to school on a regular basis however as a bus will pick them up.  AR 368.

11       With regard to medical treatment, Plaintiff testified that she is fully compliant and

12  follows all treatment recommendations and takes all medications as prescribed.  AR 369.

13  Plaintiff's condition has worsened in the last five years.  AR 369.  She sees a psychiatrist every

14  three months and is taking Zoloft to treat depression.  AR 369-370.  Plaintiff sees her orthopedist

15  about three times annually, and did so about three months prior to the date of the hearing.  On

16  that occasion, the doctor advised she was permanent and stationary.  AR 383-384.

17       Plaintiff testified that she can lift about twenty pounds, could stand and sit for about ten

18  minutes, and can walk about four blocks before needing to rest.  AR 370.  She indicated that out

19  of an eight hour period, she would need to elevate her feet for about four of the eight hours.  AR

20  370-371.  She has difficulty concentrating or paying attention and testified that she can

21  concentrate for about fifteen minutes at the most.  She wakes frequently during the night.  AR

22  371.

23       When asked how she got along with strangers while shopping, for example, Plaintiff

24  replied that she was "okay."  AR 371.  She reads every day for about thirty minutes, watches

25  about an hour of television a day, and walks the dogs for about fifteen minutes around the

26

27       [4]*But see* AR 372.

28       [5]*But see* AR 110 [Function Report of 2/6/06 wherein Plaintiff indicates she attended church as social
    activity].

1    perimeter of the family home.  AR 371-372.  She also uses the computer for about two hours a

2    day, at fifteen minutes intervals.  AR 372-373.

3         In response to questioning by her attorney, Plaintiff testified that she has been wearing

4    ankle braces for five years, and does so for "eight hours a day at least."  She removes the brace

5    when she goes to bed at night.  AR 383.

6         VE Dachelet testified that Plaintiff's past relevant work was classified as sedentary, semi-

7    skilled.  AR 374-375.  The associated skills were bookkeeping, telephone, oral and written

8    communication, hospital records keeping system, and simple computer skills.  AR 375.  The

9    skills are transferable within the sedentary, semi-skilled, light clerical classification.  AR 375.

10        The VE was asked to assume a worker of Plaintiff's education and work experience, who

11   can stand and walk four hours in an eight-hour day, without an assistive device, can lift five

12   pounds frequently and fifteen pounds occasionally, and postural activities would be limited if

13   weight bearing on the ankle were required.  The VE testified that this person could perform

14   Plaintiff's past relevant work.  AR 376.  Alternatively, the hypothetical worker could also

15   perform unskilled sedentary work, and semi-skilled sedentary clerical work.  There are 68,305

16   positions in the general clerical class within California.  AR 377.

17        In the second hypothetical, the VE was asked about a worker with Plaintiff's education

18   and work experience, who: can lift and carry twenty pounds occasionally, less than ten pounds

19   frequently; can stand and walk for two hours in an eight-hour period; sit for six hours in an eight-

20   hour period; push or pull lower extremities, yet only occasionally with the right ankle; cannot use

21   ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel,

22   crouch and crawl; and should avoid even moderate exposure to vibration and hazards such as

23   machinery and heights.  AR 377-378.  VE Dachelet testified that this worker could perform the

24   same past relevant work as the previous hypothetical worker. AR 378.

25        In the third hypothetical, the VE was asked about a person who was able to maintain

26   attention and concentration, relate appropriately to others, can handle funds, carry out, remember

27   and understand simple instructions, is able to respond appropriately to usual work situations, and

28   changes in routine.  The VE testified that these restrictions would allow semi-skilled work, and

1  thus past relevant work is available.  AR 378-379.  This hypothetical worker could also perform

2  all other unskilled, sedentary work.  AR 379.

3  In the fourth hypothetical, the VE was asked about an individual with limitations

4  involving sitting for two hours of an eight-hour day, and standing or walking for four hours of an

5  eight-hour day.  There is no past relevant work for this hypothetical worker because the

6  limitations permit only six hours of work in an eight-hour workday.  AR 379-380.

7  In the fifth hypothetical, the VE was asked about an individual with limitations involving

8  frequent interference with attention and concentration, capable of low stress, who can walk four

9  blocks, sit for thirty minutes at a time, stand for twenty minutes at a time, can sit about two hours

10  of an eight-hour day and stand and walk about four hours in an eight-hour day.  Those

11  limitations, the VE testified, would "close the world of work" to the hypothetical worker.  No

12  past relevant work would apply.  AR 380.

13  In the sixth hypothetical, the worker is moderately limited in the ability to remember

14  locations and workplace procedures, to understand and remember short, simple one or two-step

15  instructions, to understand detailed instructions, to maintain attention and concentration.  These

16  limitations would also "close the world of work," including past relevant work, to the

17  hypothetical worker.  AR 380-381.

18  In the final hypothetical, the VE was asked about a worker with Plaintiff's education and

19  work experience, who could concentrate in fifteen-minute increments, lift and carry twenty

20  pounds, stand and sit for ten minutes at a time each, walk four blocks, and must elevate his or her

21  feet for four hours in an eight-hour workday.  The VE testified that such a worker could not

22  perform Plaintiff's past relevant work, nor could this person perform other generally occurring

23  work.  AR 381.

24  _____Medical Record_

25  The entire record was reviewed by the Court, however, only those portions relevant to the

26  instant proceedings are briefly summarized below.

27  //

28  //

5

1          1.     *Claude M. Schutz*

2          On February 9, 2004, Claude M. Schutz, D.P.M., completed a Summary Progress Report

3    regarding Plaintiff's injury.  AR 233-235.  Plaintiff was referred to Dr. Schutz on March 14,

4    2002.  That examination was negative for "push-pull and for inversion-eversion stress," and

5    Plaintiff was provided an ankle brace.  Subsequent CT scan and MRI "revealed a cystic mass in

6    the sinus tarsi calcaneus area just under the joint."  AR 233.  Following pain management

7    treatment, and continued complaints of pain, Plaintiff underwent surgical intervention on May 6,

8    2003.  AR 234.  The cyst, located "very close to the subtalar joint" was removed.  AR 234.

9    Plaintiff improved and felt about forty percent better than she had prior to surgery.  Continued

10   improvement brought post-surgical improvement of "approximately 65-70%" as compared to

11   prior to surgery.  AR 234.  Orthotics were ordered and pain management continued.  Dr. Schutz

12   noted "the patient feels definitely improved since the injury and since the surgery, although she

13   still has difficulty getting through a day without some symptoms, sometimes lasting all day."  AR

14   234.  Dr. Schutz found Plaintiff permanent and stationary at that time.  AR 235.

15         On April 16, 2006, Dr. Schutz completed a "Residual Functional Capacity

16   Questionnaire."  AR 319-322.  He diagnosed neuralgia and regional complex pain syndrome and

17   indicated Plaintiff's prognosis was guarded.  He indicated she "can't stand, can't sit too long,"

18   and feels pain everyday.  The doctor noted emotional factors of "depression" and increased

19   crying, mood swings and sleep disturbance.  AR 319.  Dr. Schutz believed Plaintiff was capable

20   of low stress job because she was "frustrated with pain hurting her ability to things - takes much

21   longer as breaks are required."  AR 320.  The doctor indicated Plaintiff: could walk four blocks

22   without rest or severe pain, could sit for thirty minutes at one time, stand for twenty minutes at

23   one time, sit about two hours total in an eight-hour day, stand or walk about four hours in an

24   eight-hour day, take numerous breaks, and would need to elevate her leg waist-high about forty

25   percent of an eight-hour work day.  AR 320-321.  Plaintiff could occasionally lift less than ten

26   pounds, rarely lift more than ten pounds and never lift twenty or fifty pounds.  AR 321.  She

27   could occasionally twist and stoop, rarely crouch and climb stairs, and never climb ladders.  AR

28

1  322.  Plaintiff was likely to be absent about four days per month as a result of her impairments.

2  AR 322.

3        In a "Podiatry Progress Note" dated May 7, 2007, Dr. Schutz advises that Plaintiff is

4  permanent and stationary and "that what can be done to this patient has been done."  The doctor

5  handwrote "[patient] is unable to work and will not return to the work force due to the chronicity

6  of her symptoms."  AR 294.

7        On August 3, 2007, Dr. Schutz completed a "Multiple Impairment Questionnaire."  AR

8  311-318.  Referring to Plaintiff's appointment on May 7, 2007, Dr. Schutz indicated his

9  diagnosis was "neuralgia & regional complex pain syndrome" with a prognosis of "poor to fair."

10  AR 311.  Due to pain and burning sensations in her right foot, the doctor indicated his patient

11  could not "stand or sit too long."  AR 311.  He indicated Plaintiff's pain was "constant" and

12  assigned her pain a seven on a scale of one-to-ten.  He assigned fatigue a four on the same scale.

13  AR 313.  Considering a five day work environment, Dr. Schutz indicated Plaintiff could sit for

14  two hours, and stand or walk for four hours.  The doctor indicated it would be necessary or

15  medically recommended that Plaintiff not sit continuously, and that she must get up and move

16  around every thirty minutes.  AR 313.  Plaintiff could occasionally lift and carry up to ten

17  pounds, but she could never lift or carry more than ten pounds.  AR 314.  Dr. Schutz indicated

18  that Plaintiff's symptoms would "likely increase if he/she were placed in a competitive work

19  environment."  AR 315.  The doctor indicated that Plaintiff experienced "pain, fatigue or other

20  symptoms severe enough to interfere with attention and concentration" on a frequent basis.  AR

21  316.  He indicated that emotional factors contribute, and that the condition will last twelve

22  months or more.  AR 316.  In response to "[t]o what degree can your patient tolerate work

23  stress," Dr. Schutz wrote "do not know."  AR 316.  He believed Plaintiff would likely be absent

24  "[m]ore than three times a month" from work as a result of her impairment.  AR 317.  Asked

25  what other limitations would affect his patient, Dr. Schutz indicated "psychological limitations"

26  in addition to prohibiting pushing, pulling, kneeling, or bending.  AR 317.

27  //

28  //

1          2.     *Roy O. Kroeker*

2          On May 19, 2004, Roy O. Kroeker, D.P.M., performed a comprehensive medical/legal

3    podiatric orthopedic evaluation of Plaintiff.  AR 141-153.

4          Plaintiff related that she fell on January 30, 2002, as she left the billing department at

5    John C. Fremont Hospital where she was employed as a billing clerk.  She slipped on ice and fell,

6    injuring her right ankle.  A strain was diagnosed in the hospital's emergency room.  A splint was

7    applied and Plaintiff was off of work for five days, before returning to work on a modified

8    schedule.

9          A subsequent provider ordered a CT scan and a bone cyst was found in the right

10   calcaneus.  Plaintiff was treated for pain by Dr. Ramnanan, who presumed reflex sympathetic

11   dystrophy and administered two injections.  Various pain medications were prescribed, yet

12   Plaintiff indicated the medication did not provide significant relief.  The cyst was excised in

13   surgery and initially Plaintiff said she experienced some relief, but after returning to work, the

14   pain worsened.  AR 142.

15         Plaintiff advised Dr. Kroeker of a significant popping noise that occurs ten to fifteen

16   times a day, causing immediate pain.  She was using a fracture equalizer walker for stability.  AR

17   142.  Plaintiff complained of constant, throbbing pain.  Walking increases her discomfort.  She

18   can walk a quarter block without the walker, but then the pain is so bad she almost has to stop.

19   AR 143.  Plaintiff was observed with a noticeable limp on the right side and had difficulty

20   moving on and off the examination table.  AR 144.

21          Dr. Kroeker's examination noted decreased motor strength on the right side due to pain,

22   yet the doctor could not completely able to evaluate the strength or lack thereof.  AR 144.

23   Plaintiff's ankle exhibited no edema, laxity or instability.  The doctor noted that "[j]ust about

24   anywhere [he] touched or held her right foot caused significant pain and she jumped and/or

25   withdrew."  AR 144.  Asked to walk a thirty foot runway, Plaintiff had to balance with both

26   hands against the walls.  She guardedly placed her right foot and heel down and would not swing

27   her arms even when asked to try.  She could not walk on her toes or heels.  AR 145.

28

Dr. Kroeker's impression was status post slip and fall injury, i.e., strain/sprain syndrome, right lateral ankle, status post incision, drainage and packing of calcaneal cyst via subtalar joint, and chronic persistent pain.  AR 149.

The doctor found Plaintiff had a "mild component of reflect sympathetic dystrophy," but the injections had been beneficial.  Dr. Kroeker offered no treatment recommendation at that time.  He concurred with Dr. Schutz that Plaintiff was permanent and stationary, noting that Plaintiff has only "mild atrophy" with an unquantifiable decrease in strength.  The doctor found Plaintiff capable of working at her then-current job with a restriction of "excessive walking on uneven terrain."  AR 150.

       3.   *Steven C. Swanson*

Psychologist Steven C. Swanson prepared a psychological assessment of Plaintiff on March 18, 2006.  AR 162-167.

Other than the doctor noting Plaintiff having "poor dentition" there was nothing remarkable about her physical presentation as "[h]er appearance reflected satisfactory concern for personal hygiene and grooming."  AR 163-164.

Plaintiff was fully oriented to person, time, place and situation.  She was friendly and cooperative, and maintained eye contact. Plaintiff's speech was normal, her facial expressions were appropriate, her mood was euthymic to euphoric.  She reported she was "kinda down" and dwelled on her inability to do what she used to.  There was no evidence of delusion, perception disorder or hallucination, or psychotic process.  AR 164.

No suicidal or homicidal ideation was perceived, nor were vegetative signs of depression noted.  Judgment and insight were intact, and Plaintiff "maintained satisfactory attention and concentration throughout . . .."  AR 164.

Dr. Swanson did not diagnose on Axis I but noted "Adjustment Disorder with Mixed Anxiety and Depressed Mood, Chronic."  There was no diagnosis in Axis II.  Under Axis III and IV were noted the following: Plaintiff's morbid obesity and leg complaints, unemployment of she and her spouse, and four children at home.  The Axis V diagnoses was a current GAF of 70.  AR 165. Dr. Swanson found Plaintiff presented "with euthymic to euphoric mood, a full range of

affect, and intermittent laughter." AR 165.  Her emotional and mental functioning were within

normal limits, and there did not appear to be any substantial restrictions to Plaintiff's daily

activities.  AR 165.

>   4.   *James A. Nowlan*

On March 18, 2006, James A. Nowlan, Jr., M.D., performed a comprehensive medical

examination of Plaintiff.  AR 168-171.

Plaintiff advised Dr. Nowlan that she fell and suffered a sprain in January 2002.  She

stated the pain was constant and is "unchanged from the initial pain." AR 168.  She advised

removal of the cyst "produced no relief" from the pain, the pain is worse with weight bearing and

she now suffers from right knee pain and lower back pain.  AR 168.

With regard to Plaintiff's coordination, station and gait, Dr. Nowlan's examination

revealed Plaintiff was "limping favoring her right leg." AR 169.  Range of motion in the ankle

joints revealed "[d]orsiflexion 0-20 degrees and plantar flexion 0-40 degrees on the left. Right

ankle has dorsiflexion of 10 degrees and plantar flexion of 15 degrees.  Eversion and inversion

were about five degrees." AR 169.  Generally, regarding the right ankle, the doctor noted a scar

and tenderness, "with a fairly brisk pain response." AR 170.

Dr. Nowlan concluded that Plaintiff could stand and walk for four hours in an eight-hour

day, and could sit for an unlimited period without an assistive device.  Additionally, while

walking, Plaintiff could lift and carry five pounds frequently and fifteen pounds occasionally;

while sitting, Plaintiff could lift and carry fifteen pounds frequently and forty pounds

occasionally.  Weight bearing on her right ankle would be "limited to some extent" for purposes

of postural limitation.  The doctor did not identify any manipulative limitations.  AR 170-171.

>   5.   *Helen C. Patterson*

On July 27, 2006, Helen C. Patterson, Ph.D., completed a Psychiatric Review Technique

regarding Plaintiff's mental health.  AR 273-279.

Dr. Patterson found Plaintiff's affective disorder "not severe." AR 273.  The doctor

noted Plaintiff's degree of limitation was "mild" with regard to (1) restriction of activities of

daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining

1    concentration, persistence or pace.  She found no limitation regarding episodes of

2    decompensation.  AR 277.  Dr. Patterson's review believed Plaintiff's medical record was

3    "consistent in indicating claimant's depression to cause only mild functional restrictions."  AR

4    279.

5                6.    *David A. Browne*

6         In a Mental Disorder Questionnaire Form dated February 14, 2006, Dr. Browne noted

7    Plaintiff's "depressive symptoms" were stable, that she was being treated with counseling and

8    prescription medications Zoloft and Temazepam.  AR 157.  Plaintiff's symptoms included

9    "crying spells" and "insomnia."  AR 157.  Dr. Browne noted Plaintiff suffered from "no

10   cognitive deficits" and did not lose touch with reality.  AR 158-159.  Objective signs of affective

11   disorder were noted to be "depressed affect crying, low energy, insomnia, feeling of

12   hopelessness, being overwhelmed."  AR 159.  It was noted that Plaintiff was able to care for her

13   personal affairs, function socially, and did not suffer from an inability to maintain attention or

14   concentration.  AR 159-160.  Dr. Browne noted Plaintiff "would be able mentally to adapt.

15   Limitations are from pain and limitations of motion of [right] leg."  AR 160.

16        On May 3, 2007, David A. Browne, M.D., completed a "Mental Impairment

17   Questionnaire" regarding Plaintiff.  AR 323-329.  Dr. Browne indicated he treated Plaintiff every

18   three months or so, and indicated she suffered from "depression in response to severe ankle

19   injury and pain that is intractable - some depression continues."  AR 323.  The doctor indicated

20   Plaintiff had "low motivation" and felt "hopelessness" due to her depression and pain.  He

21   believed her prognosis was "poor unless [her] ankle heals."  AR 323.  Asked to identify his

22   patients signs and symptoms, Dr. Browne checked the following categories: anhedonia or

23   pervasive loss of interest in almost all activities, decreased energy, blunt, flat or inappropriate

24   affect, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating,

25   persistent disturbances of mood or affect, emotional withdrawal or isolation, and sleep

26   disturbance.  AR 324.  Dr. Browne indicated Plaintiff was moderately limited in understanding

27   and memory, and then indicated she was "serious limited, but not precluded" in all listed mental

28   abilities necessary to perform unskilled work.  AR 325-327.  Additionally, the doctor checked

1    moderately limited for all abilities listed under "sustained concentration and persistence."

2    Plaintiff was also moderately limited with regard to social interaction and adaptation.  AR 327-

3    328.  Every work-related stressor scenario was selected by Dr. Browne as one that would

4    increase Plaintiff's previously-identified limitations.  AR 328.  The doctor believed Plaintiff

5    would be absent more than three or four times per month as a result of her impairments.  Dr.

6    Browne indicated that Plaintiff's onset of disability was June 2006.  AR 329.

7         On June 12, 2007, Dr. Browne authored a letter addressed "To whom it may concern"

8    wherein he indicated Plaintiff was "totally disabled from working because of chronic pain

9    syndrome and depression.  She will be totally disabled fore more than one year."  AR 330.

10        ALJ's Findings

11        The ALJ determined that Plaintiff had the severe impairments of obesity, bilateral

12   calcaneal spurs, plantar spurs and status post subchondral cyst removal in the right ankle.

13   Nonetheless, the ALJ determined these severe impairments did not meet or equal any listing

14   impairments so as to result in a disability finding.  With regard to Plaintiff's symptoms of

15   possible adjustment disorder, the ALJ found that "no more than 'slight' abnormalities that have

16   no more than a 'minimal' effect" do not amount to a severe impairment.  AR 20-21.

17        Based on his review of the medical evidence, the ALJ determined that Plaintiff retained

18   the residual functional capacity ("RFC") to perform a wide range of sedentary work with certain

19   limitations.  AR 21-22.

20        Given this RFC, the ALJ found that Plaintiff could return to her past work as an account

21   representative as it did not require work-related activities precluded by the RFC.  AR 25.

22   Alternatively, the ALJ found that, even assuming Plaintiff could not perform her past relevant

23   work and lacked transferable skills, Plaintiff could still perform a significant number of other

24   jobs in the national economy consistent with her impairments, limitations, age, education and

25   experience, in the semiskilled and sedentary job categories.  AR 26.

26                              **SCOPE OF REVIEW**

27        Congress has provided a limited scope of judicial review of the Commissioner's decision

28   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

1   the Court must determine whether the decision of the Commissioner is supported by substantial

2   evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

3   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

4   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

5   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

6   401.  The record as a whole must be considered, weighing both the evidence that supports and

7   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

8   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

9   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

10  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

11  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

12  substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

13  Cir. 1987).

## **REVIEW**

15        In order to qualify for benefits, a claimant must establish that he is unable to engage in

16  substantial gainful activity due to a medically determinable physical or mental impairment which

17  has lasted or can be expected to last for a continuous period of not less than twelve months.  42

18  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

19  such severity that he is not only unable to do her previous work, but cannot, considering his age,

20  education, and work experience, engage in any other kind of substantial gainful work which

21  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

22  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

23  Cir. 1990).

24        In an effort to achieve uniformity of decisions, the Commissioner has promulgated

25  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

26  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  This five-step analysis can be summarized as

27  follows: (1) determination of whether the claimant is engaged in substantial gainful activity; if so

28  engaged, the claimant is not presumed disabled and the analysis ends; (2) if not engaged in

1    substantial gainful activity, determination of whether the claimant has a severe impairment; if

2    not, the claimant is not presumed disabled and the analysis ends; (3) if the claimant has a severe

3    impairment, determination of whether any such severe impairment meets any of the impairments

4    listed in the regulations; if so, the claimant is disabled and the analysis ends; (4) if the claimant's

5    impairment is not listed, determination of whether the impairment prevents the claimant from

6    performing his or her past work; if not, the claimant is not presumed disabled and the analysis

7    ends; and (5) if the impairment prevents the claimant from performing his or her past work,

8    determination of whether the claimant can engage in other types of substantial gainful work that

9    exist in the national economy; if so, the claimant is not disabled and the analysis ends.

10       Here, Plaintiff argues that (1) her mental impairment is severe; (2) the ALJ improperly

11   rejected her treating physician's opinion; (3) the ALJ did not properly incorporate her obesity

12   into the RFC; and (4) the ALJ erroneously discredited her testimony.

13                                          **DISCUSSION**

14   **A.       Plaintiff's Depression**

15       Plaintiff asserts the ALJ committed error in finding her depression does not amount to a

16   legally severe impairment, and thus failed to consider its impact at steps four and five of his

17   analysis.  Defendant contends the ALJ properly rejected the opinion of Plaintiff's treating

18   physician in concluding her depression was not a severe impairment.

19       **1.       The Law**

20       An impairment or combination of impairments is found "not severe" and a finding of "not

21   disabled" is properly made at step two when medical evidence establishes that a claimant has

22   only a slight abnormality which would have no more than a minimal effect on his or her physical

23   or mental ability to perform basic work activities.  SSR 85-28.

24       The listings of impairments describe impairments "that are considered severe enough to

25   prevent an adult from doing any gainful activity."  20 C.F.R. § 416.925(a).  Most of these

26   impairments are permanent or expected to result in death.  *Id.*  For all other impairments, the

27   evidence must show that the impairment has lasted or is expected to last for a continuous period

28

of at least 12 months.  *Id.*  If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.  20 C.F.R. § 416.920(d).

To demonstrate that an impairment matches a listed impairment, the claimant must show that the impairment meets all of the medical criteria in a Listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*  To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a).  Under the law of this circuit, "[i]t is unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments."  *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990).

A mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  20 C.F.R. § 416.908.  Symptoms are a claimant's own description of his or her impairment, and alone are not enough to establish a mental impairment; signs include observable psychological abnormalities and must be medically demonstrable phenomena;  laboratory findings must be shown through medically acceptable laboratory techniques.  20 C.F.R. § 416.928.  The regulations are clear that reports about a claimant's impairments must come from "acceptable medical sources," and that a licensed social worker is not an accepted medical source.  20 C.F.R. § 416.913(a).

To determine whether a plaintiff has a mental impairment, one must assess the impairment according to the Regulations.  20 C.F.R. pt. 404, app. 1, subpt. P, § 112.05 (Listing 12.05).  The listing of impairments outlines criteria that claimants must meet in order to be determined impaired.  *Id.*  Listing 12.04 pertains to affective disorders.[6]

---

[6]Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1

## 2. Analysis

2      ALJ Haubner considered whether Plaintiff's depression was a severe impairment and

3   found as follows:

4      The psychological consultative examiner did not diagnose the claimant with a
       definite psychiatric disorder, but diagnosed the claimant with only a possible
5      adjustment disorder with mixed anxiety and depressed mood. The consultative
       examiner determined the claimant had no significant work-related limitations on
6      her ability to perform simple and repetitive work activity on a consistent basis.
       The consultative examiner stated the claimant remained capable of performing
7      simple job instructions.  However, I note that the consultative examiner did not

8   _____

9         1. Depressive syndrome characterized by at least four of the following:
          a. Anhedonia or pervasive loss of interest in almost all activities; or
10        b. Appetite disturbance with change in weight; or
          c. Sleep disturbance; or
11        d. Psychomotor agitation or retardation; or
          e. Decreased energy; or
12        f. Feelings of guilt or worthlessness; or
          g. Difficulty concentrating or thinking; or
13        h. Thoughts of suicide; or
          i. Hallucinations, delusions, or paranoid thinking; or
14        2. Manic syndrome characterized by at least three of the following:
          a. Hyperactivity; or
15        b. Pressure of speech; or
          c. Flight of ideas; or
16        d. Inflated self-esteem; or
          e. Decreased need for sleep; or
17        f. Easy distractibility; or
          g.  Involvement in activities that have a high probability of painful consequences which
18     are not recognized; or
          h. Hallucinations, delusions or paranoid thinking; or
19        3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic
       picture of both manic and depressive syndromes (and currently characterized by either or both
20     syndromes);
       AND
21        B. Resulting in at least two of the following:
          1. Marked restriction of activities of daily living; or
22        2. Marked difficulties in maintaining social functioning; or
          3. Marked difficulties in maintaining concentration, persistence, or pace; or
23        4. Repeated episodes of decompensation, each of extended duration;
       OR
24        C. Medically documented history of a chronic affective disorder of at least 2 years'
       duration that has caused more than a minimal limitation of ability to do basic work activities, with
25     symptoms or signs currently attenuated by medication or psychosocial support, and one of the
       following:
26        1. Repeated episodes of decompensation, each of extended duration; or
          2. A residual disease process that has resulted in such marginal adjustment that even a
27     minimal increase in mental demands or change in the environment would be predicted to cause the
       individual to decompensate; or
28        3. Current history of 1 or more years' inability to function outside a highly supportive
       living arrangement, with an indication of continued need for such an arrangement.

determine the claimant was precluded from performing more complex or detailed work activity, but merely stated that she could perform simple job instructions [citation].  [¶]  The psychological consultative examiner also determined the claimant's GAF (Global Assessment of Functioning) was 70 [citation].  A GAF of 70 indicates the claimant was having borderline mild to slight symptoms or borderline mild to slight difficulty in social, occupational, or school functioning.  A GAF of 61 to 70 indicates the person is generally functioning pretty well and has some meaningful interpersonal relationships.  A GAF of 71 to 80 indicates the person has no more than slight impairment in social, occupational, or school functioning . . .. [¶] The claimant's treating physician described [her] depression as being stable and determined she had essentially no work-related limitations resulting from the depression [citation].  The lack of any limitations imposed by the claimant's treating physician speaks volumes about the relatively mild nature of the claimant's depression symptoms. [¶] The State Agency psychiatric consultant determined the claimant had no more than mild functional limitations from the possible adjustment disorder.  The State Agency psychiatric consultant determined the claimant's limitations were so minimal that it justified finding the claimant had no "severe" mental impairment [citation]. [¶]  For all the reasons above, I find the claimant's symptoms from her possible adjustment disorder are no more than "slight" abnormalities that have no more than a "minimal" effect upon her ability to work.  Accordingly, her possible adjustment disorder is not a "severe" impairment as that term is defined . . ..

AR 20-21.

In his psychological assessment of March 2006, Dr. Swanson noted Plaintiff was fully oriented to time, person, place and situation; she was friendly and cooperative and maintained eye contact.  Her speech was normal and her facial expressions were appropriate.  She reported that she was "'kinda down'" but there was no evidence of delusion, perception disorder or hallucination, or psychotic process.  Plaintiff did not suffer from suicidal or homicidal ideation, nor were signs of vegetative depression present.  Her judgment and insight were intact and she "'maintained satisfactory attention and concentration throughout and the results are considered a valid representation of her current functioning.'" AR 162-164.  More particularly, Dr. Swanson noted as follows:

She denied psychotic symptomatology and there was no evidence of any serious psychopathological disturbance.  She is bitter about her termination earlier this year from her work position due to reported conflict with her supervisor; *nevertheless, she presents with euthymic to euphoric mood, a full range of affect, and intermittent laughter.  Mental and emotional functioning is seen as falling within normal limits.*  Her medical health is notable for morbid obesity in addition to the aforementioned.

*Connie is judged as able to maintain concentration or relate appropriately to others in a job setting.*  She would be able to handle funds in her own best interests.  She is expected to understand, carry out, and remember simple instructions.  She is judged as able to respond appropriately to usual work

1

2

> situations, such as attendance, safety and the like.  Changes in routine would not be very problematic for her.  *There do not appear to be substantial restrictions in daily activities*.

3  AR 165, emphasis added.  As a consultive examiner, Dr. Swanson's opinion may constitute

4  substantial evidence because it rests on independent clinical findings.  *See Tonapetyan v. Halter*,

5  242 F.3d 1144, 1149 (9th Cir. 2001).

6  In February 2006, Dr. Browne noted "depressive symptoms" since January 2002 when

7  Plaintiff sustained injury.  He referenced "severe symptoms with crying spells, insomnia" related

8  to frustration regarding the pain and limitations caused by the injury.  The doctor stated Plaintiff

9  "has thinking affect by depressed mood," but found Plaintiff did not suffer from a cognitive

10  deficit.  AR 158.  Dr. Browne also reported that Plaintiff had not experienced a loss of touch with

11  reality, and she had the ability to care for her personal affairs, the ability to function socially, and

12  to pay attention and follow instructions.  AR 157-161.

13  With specific regard to Dr. Browne's opinion in May 2007, the ALJ noted:

14

15

16

17

18

> Just before the hearing, the claimant's attorney representative submitted a brief note and fill-in-the-blanks/check-the-blocks type of form from David A. Browne, M.D., indicating limitations that would generally prevent the performance of substantial gainful activity [citation].  However, the opinions lacked supporting bases for the conclusions regarding the limitations, such as the claimant's clinical signs and whether the given limitations were based upon the claimant's subjective complaints or upon objective findings or observations.  [Citations.] Even more significant, the opinions stated by Dr. Browne . . . are inconsistent with Dr. Browne's own prior statements [citation].

19  AR 24.  Here, the ALJ gave sufficient reasons, supported by substantial evidence in the record,

20  for rejecting the May 2007 opinion of Dr. Browne.  An ALJ need not accept a treating

21  physician's opinion that is conclusory and brief and unsupported by clinical findings.

22  *Tonapetyan v. Halter*, 242 F.3d at 1149.  Because Dr. Browne's opinion in May 2007 was

23  unsupported by clinical findings, the ALJ properly elected to afford it little weight.  *Batson v.*

24  *Commissioner of Social Security Administration*, 359 F.3d 1190, 1195 (9th Cir. 2004) (checklist

25  properly rejected for it "lacked substantive medical findings to support conclusion"); *see also*

26  *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *Young v. Heckler*, 803 F.2d 963, 968 (9th

27  Cir. 1988).

28

Additionally, as noted by the ALJ, Dr. Browne's May 2007 findings conflict with his earlier findings significantly.  Whereas Dr. Browne specifically stated that Plaintiff did not suffer from any cognitive deficit, was able to maintain her personal affairs, function socially, and maintain focus and concentration in February 2006, in May 2007 the doctor indicated Plaintiff was moderately limited in understanding and memory, indicated she was "seriously limited, but not precluded" in all listed mental abilities necessary to perform unskilled work, and moderately limited with regard to social interaction, as well as for all abilities listed under "sustained concentration and persistence."  AR 325-328.

Notably, a review of Dr. Browne's own treatment notes between the period of February 2006 through May 2007 does not establish any objective bases for Dr. Browne's latter opinion. The notes are lacking for clinical findings.  *See* AR 183, 214, 292-293, 297-298.

Finally, Dr. Patterson's psychiatric review concluded that Plaintiff's affective disorder was "not severe."  The doctor indicated Plaintiff's limitations were "mild" regarding the activities of daily living, social functioning, and maintaining concentration.  AR 273-279.  Dr. Patterson's opinion is consistent with Dr. Swanson's opinion.  *Tonapetyan v. Halter*, 242 F.3d at 1149 ("contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record").

In sum, there is sufficient evidence to support the ALJ's finding of no more than slight possible adjustment disorder.  AR 20-21.  Thus, the ALJ did not err and his findings are supported by substantial evidence.

**B.**   **The Opinion of Treating Physician Schutz**

Plaintiff contends the ALJ erred in rejecting the opinions of Plaintiff's podiatrist. Defendant counters the ALJ properly rejected the opinions as conclusory, brief and unsupported by clinical findings, and as beyond the doctor's area of expertise.

//

//

//

1        **1.      The Law**

2        The opinions of treating doctors should be given more weight than the opinions of

3   doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998);

4   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not

5   contradicted by another doctor, it may be rejected only for "clear and convincing" reasons

6   supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating

7   doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without

8   providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.*

9   (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out

10  a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

11  interpretation thereof, and making findings.  *Magallanes  v. Bowen*, 881 F.2d 747, 751 (9th

12  Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own

13  interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849

14  F.2d 418, 421-22 (9th Cir.1988).

15       In *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and

16  expounded upon its position regarding the ALJ's acceptance of the opinion of an examining

17  physician over that of a treating physician.  "When an examining physician relies on the same

18  clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions

19  of the examining physician are not '"substantial evidence."'  *Orn,* 495 F.3d at 632; *Murray*, 722

20  F.2d at 501-502.  "By contrast, when an examining physician provides 'independent clinical

21  findings that differ from the findings of the treating physician' such findings are 'substantial

22  evidence.'"  *Orn*, 496 F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985).

23  Independent clinical findings can be either (1) diagnoses that differ from those offered by another

24  physician and that are supported by substantial evidence (*see Allen v. Heckler*, 749 F.2d 577, 579

25  (9th Cir.1985)), or (2) findings based on objective medical tests that the treating physician has

26  not herself considered (*see Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)).

27       If a treating physician's opinion is not given controlling weight because it is not well

28  supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

1  instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6)

2  in determining what weight to accord the opinion of the treating physician.  Those factors include

3  the "[l]ength of the treatment relationship and the frequency of examination" by the treating

4  physician; and the "nature and extent of the treatment relationship" between the patient and the

5  treating physician.  20 C.F.R. 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of

6  the opinion, consistency with the record as a whole, the specialization of the physician, and the

7  extent to which the physician is familiar with disability programs and evidentiary requirements.

8  20 C.F.R. § 404.1527(d)(3)-(6).   Even when contradicted by an opinion of an examining

9  physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to

10  deference."  SSR 96-2p; *Orn*, 495 F.3d at 632-633.  "In many cases, a treating source's medical

11  opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the

12  test for controlling weight."  SSR 96-2p; *Orn*, 495 F.3d at 633.

13    Licensed podiatrists may be relied upon as an acceptable medical source "for purposes of

14  establishing impairments of the foot, or foot and ankle only . . .."  20 CFR § 404.1513(a)(4).

15    **2.    Analysis**

16    Here, the ALJ noted that

17    Not long before the hearing, the claimant's representative submitted a fill-
     in-the-blanks/check-the-blocks type of forms indicating limitations that would
18    generally prevent the performance of substantial gainful activity [citations].
     However, the opinions lacked supporting bases for the conclusions regarding
19    limitations, such as the claimant's clinical signs, test results, and whether the
     given limitations were based upon the claimant's subjective complaints or upon
20    objective findings or observations.  Also, the signer of the forms did not provide
     information in the forms about his qualifications, but after reviewing the medical
21    records, it appears the signer of these forms is a DPM (a podiatrist).  Podiatry is
     the field of medicine that specializes in the study and care of the foot and ankle.
22    There is nothing in the record suggesting the claimant's podiatrist is also a
     specialist in orthopedic surgery, neurosurgery, or any other medical field
23    [citation].  Therefore, it clearly seems that some of the limits imposed on the
     claimant by the signer of Exhibits 10F and 11F (*e.g.*, pushing, pulling and bending
24    []) are outside the signer's area of expertise.  This fact strongly suggests the
     opinions of the signer . . . that deal with issues other than the claimant's feet
25    should be discounted or disregarded.

26  AR 24.  As explained, the ALJ rejected Dr. Schutz's opinions because they lacked supporting

27  bases: clinical signs, test results, and indication as to whether the limitations recommended were

28  the result of "claimant's subjective complaints or upon objective findings and observations."

1   were not supported by clinical findings.  *See Batson v. Commissioner*, 359 F.3d at 1195; *Crane v.*

2   *Shalala*, 76 F.3d at 253; *Young v. Heckler*, 803 F.2d at 968; *see also Morgan v. Comm'r of the*

3   *Soc. Sec. Admin*., 169 F.3d 595, 602 (9th Cir.1999) ( "A physician's opinion of disability

4   'premised to a large extent upon the claimant's own accounts of his symptoms and limitations'

5   may be disregarded where those complaints have been 'properly discounted'") (quoting *Fair v.*

6   *Bowen*, 885 F.2d 597, 605 (9th Cir.1989)).

7        In the Multiple Impairment Questionnaire dated August 3, 2007, when asked to identify

8   the "positive clinical findings" in support of his diagnosis of "neuralgia" and "regional complex

9   pain syndrome," Dr. Schutz wrote "pain & burning sensations to [right] foot & subtalar [joint]"

10  and that Plaintiff could not "stand or sit too long."  AR 311.  Asked to identify laboratory or

11  diagnostic test results that support his diagnoses, Dr. Schutz wrote "clinical evaluation."  AR

12  312.

13       A review of Dr. Schutz's treatment notes do not reflect specific findings related to

14  Plaintiff's functional abilities and/or limitations.  AR 218, 225-232, 236, 240-241, 243-245, 247-

15  250, 257-258.  The treatment notes make no reference to Plaintiff being limited with regard to

16  pushing, pulling or bending in any way.  A number of the notes specifically reference that

17  Plaintiff's pain was increased with increased activity or "extensive walking."   In fact, in his

18  February 9, 2004, progress report, Dr. Schutz indicated his examination was negative for "push-

19  pull and for inversion-eversion stress."  AR 233.

20       Dr. Schutz's May 2007 opinion is not consistent with the record as a whole.  Dr. Nowlan

21  found no manipulative limitations applied to Plaintiff, and indicated a single postural limitation

22  of weight bearing on the right ankle.  AR 170-171.  Dr. Kroeker's report included only a work

23  restriction of "excessive walking on uneven terrain."  AR 150.

24       In sum, the ALJ declined to assign Dr. Schutz's opinion controlling weight because it was

25  inconsistent with the record as a whole and was based upon "minimal medical signs and

26  laboratory findings."  *See Orn v. Astrue*, 496 F.3d at 632; *Allen v. Heckler*, 749 F.2d at 579.  The

27  ALJ did not err.

28  //

**C.**     **Obesity And RFC**

Plaintiff argues the ALJ erred in finding Plaintiff's obesity to be legally severe where he

later failed to incorporate consideration of Plaintiff's obesity into his RFC finding.  Defendant

responds that the ALJ limited Plaintiff in "her postural activities" and to sedentary work, a

significantly reduced RFC in light of Plaintiff's age, and that the RFC was based on the ALJ's

analysis of the record as a whole such that consideration was given.  Defendant also contends

that by failing to identify or demonstrate how the ALJ's decision was improper, the claim has not

been preserved for purposes of appeal.

**1.     Discussion**

Plaintiff relies on *Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003) in support of her

position.  However, this matter is distinguishable from *Celaya*.  There, the Ninth Circuit

reasoned that the ALJ should have considered the claimant's obesity as a disabling factor, even

where it was not expressly argued by the claimant, because obesity was raised impliedly in

Celaya's report of symptoms, it was clear that Celaya's obesity was close to the listing criterion

and was a condition that could exacerbate her reported illness, and Celaya was proceeding pro se

and thus the ALJ had a duty to develop the record regarding her obesity.  *Celaya v. Halter*, 332

F.3d at 1182.

Significantly, unlike the claimant in *Celaya*, the record does not indicate that Plaintiff's

obesity exacerbated her other impairments nor was it raised in Plaintiff's report of symptoms.

Also, the fact Plaintiff is morbidly obese is noted by several physicians, but none have indicated

that Plaintiff's obesity adds to her limitations.  There is a single passing reference to obesity

possibly causing Plaintiff's back pain.

In *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005), the Court of Appeals pointed

out that a Plaintiff must demonstrate or identify evidence of "functional limitations as a result" of

obesity.  *Id.*, at 684.  Like the claimant in *Burch*, Plaintiff has failed to point to any evidence of

her obesity causing functional limitations.  The medical record establishes limitations regarding

right ankle pain rather than any limitation pertaining to Plaintiff's obesity.  Notably too, like the

claimant in *Burch*, Plaintiff was represented by counsel.  Yet she presented no testimony that her

1   obesity impaired her ability to work or that it affected her daily activities in any way.  AR 353-

2   385.

3          Finally, the court notes that the ALJ did consider Plaintiff's impairment by adopting the

4   opinion of the state agency medical consultant who specifically considered Plaintiff's obesity and

5   found her able to perform sedentary work.  AR 25.

6   **D.     Plaintiff's Credibility**

7          Plaintiff contends that the ALJ's reasons for finding her subjective complaints not

8   credible are insufficient as a matter of law.  Defendant responds that the ALJ's credibility finding

9   is well-supported by the evidence.

10         **1.     Applicable Law**

11         The ALJ is required to make specific findings assessing the credibility of a plaintiff's

12  subjective complaints.  *Cequerra v. Secretary of HHS,* 933 F.2d 735 (9th Cir. 1991).  In rejecting

13  the complainant's testimony, "the ALJ must identify what testimony is not credible and what

14  evidence undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

15  1996), quoting *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir.

16  1988).

17         "Despite the inability to measure and describe it, pain can have real and severe

18  debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from

19  working."  *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  It is possible to suffer disabling

20  pain even where the degree of pain is unsupported by objective medical findings.  *Id.*  "In order

21  to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that

22  decision."  *Id*., citing *Magallanes v. Bowen*, 881 F.2d at 755.  The findings must convincingly

23  justify the ALJ's rejection of the plaintiff's excess pain testimony.  *Id*. at 602.  However, an ALJ

24  cannot be required to believe every allegation of disabling pain.  "This holds true even where the

25  claimant introduces medical evidence showing that he has an ailment reasonably expected to

26  produce some pain."  *Id*. at 603.

27         Once a claimant produces medical evidence of an underlying impairment likely to cause

28  the alleged pain, the ALJ may not discredit the allegations of the severity of the pain solely

because the evidence does not support plaintiff's statements.  *Lester*, 81 F.3d at 834, citing

*Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (*en banc*).  The Court turns to address

these findings.

The ALJ may engage in ordinary techniques of credibility evaluation, such as considering

claimant's reputation for truthfulness and inconsistencies in claimant's testimony.  *Tonapetyan v.*

*Halter*, 242 F.3d at 1148; *see also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

Additionally, the ALJ , and may make inferences "logically flowing from the evidence." *Macri*

*v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996); *see Drouin v. Sullivan,* 966 F.2d 1255, 1258-59 (9th

Cir. 1992) (ALJ's observations during the hearing, along with other evidence, constitutes

substantial evidence);  *Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d at 599 (ALJ's

finding that symptoms improved with medication was valid consideration in assessing claimant's

credibility).

If a claimant is able to spend a substantial part of his day engaged in pursuits involving

the performance of physical functions that are transferable to a work setting, a specific finding as

to this fact may be sufficient to discredit a claimant's allegations.  *Morgan v. Commissioner of*

*Social Sec. Admin.,* 169 F.3d at 600.  The ALJ must make "specific findings relating to [the

daily] activities" and their transferability to conclude that a claimant's daily activities warrant an

adverse credibility determination.  *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007).

**2.    Analysis**

Here, the ALJ found as follows:

The claimant's testimony is inconsistent with the objective medical
evidence in the record.  The claimant testified that her medical condition has
steadily deteriorated without fluctuation over the past five years.  However, on
June 5, 2003, the claimant told her doctor that she had experienced an estimated
40 percent improvement after undergoing surgery on her right ankle [citation].
The claimant also alleged in her testimony that she is "fully" compliant with her
medical treatment.  However, I note she frequently refuses to be weighed by her
doctor [citation].
The claimant appears to exaggerate her limitations.  In her testimony at the
hearing, she alleged she could concentrate for no more than 15 minutes.
However, I observed the claimant pay attention and respond appropriately to
questions throughout the entire hearing, which lasted about 45 minutes.
The claimant has a poor work history.  She has only five full years of
working at the substantial gainful activity level during the past 15 years [citation].

1

2

3

4

5

6

7

8

9

   Furthermore, despite the claimant's allegations of having extensive limitations, she engages in a wide range of activities of daily living as indicated by her husband, and discussed below.  In her testimony, the claimant also admitted engaging in a wide range of activities of daily living.  For example, she admits she cares for two disabled children, she drives them to a special needs school and that she ensures they take care of their personal needs such as bathing and brushing teeth. She also admitted that she cares for all of her own personal needs, cooks once a day, preparing simple meals two to three times [a] day, washes dishes twice a day, does laundry twice a day, makes the bed once a week, changes the sheets on the beds twice a week, dusts furniture every day, sweeps and vacuums once a week, goes grocery shopping twice a week and shopping for other things once a week, talks on the telephone about five times a day, reads 30 minutes a day, watches television one hour a day and plays on a computer about two hours a day. She also admitted that she has a valid driver's licence without any restrictions, and that she drives an automobile about three times a week.

   For the reasons above, I find the claimant is not credible.

10 AR 23.  In this case, the ALJ articulated adequate reasons for finding Plaintiff's pain complaints

11 less than entirely credible.  The ALJ was particularly reliant upon Plaintiff's own testimony

12 concerning her daily activities, including caring for two disabled children, cooking and preparing

13 meals, cleaning, driving and meeting her own personal needs.  ALJ Haubner properly considered

14 Plaintiff's daily activities in his credibility analysis.  If a claimant is able to spend a substantial

15 part of his day engaged in pursuits involving the performance of physical functions that are

16 transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a

17 claimant's allegations. *See Fair v. Bowen,* 885 F.2d at 603; *see also Morgan v. Apfel*, 169 F.3d

18 595, 600 (9th Cir. 1999) (claimant's ability to fix meals, do laundry, work in the yard, and

19 occasionally care for his friend' child was evidence of claimant's ability to work).

20    In addition to the ALJ's comment about Plaintiff's ability to concentrate at the hearing,

21 the record contains other evidence of her ability to maintain concentration.  Specifically, Dr.

22 Swanson noted that Plaintiff "maintained satisfactory attention and concentration throughout" his

23 examination.  AR 164.

24    With regard to Plaintiff's testimony at the hearing that her condition had steadily

25 deteriorated, something the ALJ relied upon in assessing Plaintiff's credibility, the record

26 evidences that she told another physician, Dr. Nowlan, that surgical removal of the cyst from her

27 right ankle "produced no relief."  AR 168.  This statement is also contradictory to her statements

28

1    to Dr. Schutz following surgery on her right foot.  *See* AR 244 ("improved - by 65-70%" as of

2    7/10/03), 245 ("Pt feels she is 40+% improved").

3          In sum, the ALJ is entitled to resolve questions of credibility and conflicts in the

4    testimony.  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Here, the ALJ's credibility

5    determination is supported by substantial evidence, and is sufficiently specific to permit the

6    Court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.  *Thomas v.*

7    *Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

8                              <u>**CONCLUSION**</u>

9          Based on the foregoing, the Court finds that the ALJ's decision is supported by

10   substantial evidence in the record as a whole and is based on proper legal standards.

11   Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

12   Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in

13   favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff,

14   Constance M. Morphew.

15

16

17      IT IS SO ORDERED.

18   **Dated:   August 18, 2009**          **/s/ Gary S. Austin**
                                          UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28